UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | DOCKET NO. 3:11-CR-309-RJC |
| | ) | |
| | ) | **BILL OF INFORMATION** |
| v. | ) | |
| | ) | Violations: |
| | ) | |
| **BRYAN KEITH COATS** | ) | 18 U.S.C. § 371 |
| | ) | 18 U.S.C. § 1956(h) |

THE UNITED STATES ATTORNEY CHARGES:

At the specified times and at all relevant times:

1. From in or about October 2007 through in or about December 2009, there were a number of so-called hedge fund managers that defrauded investors by inducing them to invest with a purported foreign currency exchange program known as "Black Diamond." The scheme defrauded investor victims nationwide of over $40,000,000.

### I. Individuals and Entities

2. The defendant, BRYAN KEITH COATS, induced victims to invest in Black Diamond by making false representations and material omissions, including some of those set forth below. In addition, COATS recruited many of the other hedge fund managers to join the conspiracies, who in turn induced their own victims to invest. COATS controlled various hedge funds and entities bearing the name "Genesis Wealth," and "Coats Estate Planning," which were incorporated in North Carolina.

3. Mr. D, a co-conspirator unindicted herein, was a hedge fund manager who induced victims to invest in Black Diamond by making the false representations set forth below. In addition, Mr. D served as an "Administrator" for the hedge fund managers and pretended to be an "independent accountant" for such hedge fund managers in order to lull investors. Mr. D controlled various hedge funds and entities bearing the names Divine Circulation Services, Ltd. ("DCS"), incorporated in Belize, and Divine Circulation Services, LLC and Safe Harbor Wealth, Inc., incorporated in Ohio.

4. COATS, Mr. D, Mr. T, Mr. S, Mr. M, Stephen Lacy, James Jordan, Roy Scarboro, and Jeffrey Muyres, co-conspirators unindicted herein, were hedge fund managers who induced victims to invest in Black Diamond by making false representations and material omissions, including some of those set forth below.

1

5.  Black Diamond was controlled by unindicted co-conspirator Keith Franklin Simmons ("Simmons"), and was located in the Western District of North Carolina.

## II. Investment Fraud Conspiracies

### A. The Due Diligence Scheme

6.  In the beginning, the conspirators generally did not know that Black Diamond was a Ponzi scheme.

7.  Indeed, the conspirators knew little about Black Diamond except that it promised to make them rich with outrageous supposed returns from their victims' money.

8.  No conspirator invested any significant personal cash into Black Diamond.

9.  Instead, the conspirators sought out victims, many of whom were elderly and retired, and induced them to invest what was often their life savings.

10. The conspirators knew that they could not induce victims to invest their life savings if they told them the truth; namely, that they knew little about Black Diamond, had done no true due diligence and their so-called hedge funds had no true safeguards to ensure that investors' money was invested legitimately. Accordingly, they conspired to represent to their victims that they had done due diligence and operated legitimate hedge funds with significant safeguards, knowing that was not true.

11. Specifically, the conspirators induced victims to invest through a series of false and fraudulent representations, omissions of material facts and deceptive half-truths. Such misrepresentations generally and at various times included the following:

    a.  That the relevant hedge fund had conducted due diligence on Black Diamond when, in truth and fact, they had done no such due diligence.

    b.  That the relevant hedge fund used a variety of "analytical and research tools" in selecting Black Diamond when, in truth and fact, they had no such tools.

    c.  That the relevant hedge fund utilized a "stringent selection process," to select Black Diamond when, in truth and fact, the selection process was not stringent, but based on their own greed.

    d.  That the relevant hedge fund utilized an "anti-money laundering policy" and program when, in truth and fact, there was no such policy or program.

    e.  That the relevant hedge fund used Warren Buffet's investment philosophy to evaluate opportunities such as Black Diamond, when, in truth and fact, the philosophy did not resemble Warren Buffet's.

2

f.  That the relevant hedge fund was audited by an "independent accountant," when that accountant was simply Mr. D or his employee, who, in truth and fact, were not independent.

g.  That the relevant hedge fund only accepted accredited and sophisticated investors, when, in truth and fact, virtually no investor was turned away.

h.  That the money would be invested, when in truth and fact, some conspirators used investor money to pay recruiters "referral fees" to find and induce victims to invest.

i.  The omission of the fact that, at best, the true cost of investing in Black Diamond amounted to over eighty percent (80%) of Black Diamond's expected profits.

j.  The omission of the fact that in or about June 2009, COATS and his conspirators learned that the Commodities Futures Trading Commission (CFTC) was conducting an investigation relating to Black Diamond. Thereafter, COATS and certain conspirators agreed not to disclose the CFTC investigation to investors.

### B.  The Derivative Ponzi Scheme

12.  Beginning in early 2009, the Black Diamond Ponzi scheme began collapsing. Among other things, Simmons began refusing investor requests for withdrawals and stating to the hedge fund managers that he would return or "cash-out" all investor money. As time passed, however, Black Diamond never paid out and stopped paying money out to victims and the hedge fund managers.

13.  The conspirators knew that if victims learned the truth the conspirators knew about Black Diamond, the scheme would collapse and they would be deprived of their income stream. New victims would not invest.

14.  Accordingly, in or about March 2009, Simmons, COATS, Mr. D, Mr. T, Mr. S, Mr. M, Stephen Lacy, James Jordan, Roy Scarboro, Jeffrey Muyres and others known to the United States Attorney, agreed to start the derivative Ponzi scheme conspiracy.

15.  Specifically, they agreed that Mr. D would administer, and the hedge fund managers would operate, derivative ponzi schemes as follows:

a.  Mr. D would create a "cash account" or "liquidity account" for himself and each hedge fund manager. Mr. D would charge a heavy fee to administer these derivative Ponzi accounts.

b.  The hedge fund managers would deposit most, and eventually all, "new" victim funds into their respective cash accounts, rather than investing such funds with Black Diamond.

3

c. Mr. D and the hedge fund managers would then, in Ponzi-fashion, use the "new" investor money in the cash accounts to pay "old" investor withdrawal requests, and to support their own lifestyles.

d. From in or about April 2008 to in or about February 2010, COATS and other hedge fund managers paid Mr. D's administrative fees totaling $450,423 generally with "new" victim money. Mr. D demanded this money even though he was well aware that the source was derived from new investor victims who (1) were lied to about their money being invested with Black Diamond and (2) were never told what Mr. D knew about Black Diamond's collapse.

e. The conspirators agreed to continue to accept new investor money, and continued to falsely represent that the money would be invested in the foreign currency exchange market. COATS and others did not inform investors that their money was simply going into cash accounts rather than being invested as promised, nor that the conspirators were using new investor money to pay withdrawal requests from "old" investor victims.

f. The conspirators also agreed not to inform investors about Black Diamond's collapse, nor of the announced "cash-out," nor of Black Diamond's prolonged failure to return investor money, nor of other problems. Indeed, the conspirators' victims continued to receive blatantly false monthly statements from Mr. D. showing substantial monthly earnings.

### III. The Money Laundering Conspiracy

16  COATS and his conspirators engaged in a money laundering conspiracy in order to promote the carrying on of both the Due Diligence and Derivative Ponzi Schemes.

17. As early as March 2008, COATS and his conspirators began to engage in financial transactions derived from profits related to both the Due Diligence and Derivative Ponzi Schemes. These profits were derived directly from the funds victims transferred into Black Diamond. As summarized below, COATS and his conspirators used victim funds to conduct both profit distributions and to make payments to conspirator Mr. D for "administrative" fees.

18. On or about July 30, 2009, the conspiracy defrauded victim C.S. by obtaining $100,000 from C.S., purportedly to invest with Black Diamond, but in reality used C.S.'s money to promote the scheme, as follows:

a. On or about August 10, 2009, COATS paid Mr. D approximately $10,425 for "administrative" fees using victim C.S.'s money.

b. On or about August 31, 2009, COATS received a profit distribution of approximately $25,000 using victim C.S.'s money.

c. On or about September 4, 2009, COATS paid Mr. D approximately $10,627 for "administrative" fees using victim C.S.'s money.

4

d. On or about September 18, 2009, COATS received a profit distribution of approximately $25,000 using victim C.S.'s money.

e. On or about October 2, 2009, COATS paid Mr. D approximately $10,864 for "administrative" fees using victim C.S.'s money.

19. COATS and his conspirators conducted and caused transactions to be conducted, with the intent to promote the carrying on of the schemes by inducing the investors identified below to believe that Black Diamond was a legitimate investment venture that was, in fact, earning the returns represented, among other reasons, so that: (i) investors would invest additional money with Black Diamond or (ii) would further recommend that their friends and family invest with Black Diamond.

a. On or about March 14, 2008, COATS assisted investor J.B. in withdrawing $150,000 from his Black Diamond investment.

b. On or about December 3, 2008, COATS assisted investor D.P. in withdrawing $75,000 from his Black Diamond investment.

## COUNT ONE
### (Investment Fraud Conspiracy)

20. The United States Attorney realleges and incorporates by reference herein all of the allegations contained in paragraphs 1 through 19 of the Bill of Information, and further alleges that:

21. From in or about October 2007 through in or about December 2009, in Mecklenburg County, within the Western District of North Carolina, and elsewhere, the defendant,

**BRYAN KEITH COATS**

did knowingly combine, conspire, confederate, and agree with Mr. D, Mr. T, Mr. S, Mr. M, Stephen Lacy, James Jordan, Roy Scarboro, and Jeffrey Muyres and others unnamed in this Bill of Information, and known and unknown to the United States Attorney, to commit offenses against the United States, including violations of Title 7, United States Code, Section 6b, and Title 17, Code of Federal Regulations, Section 1.1 (commodities fraud); Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5 (securities fraud); and Title 18, United States Code, Section 1343 (wire fraud).

**Manner and Means**

22. The conspirators carried out the conspiracy in the manner and means described in paragraphs 1 through 18 of this Bill of Information, among others.

5

Case 3:11-cr-00309-RJC   Document 1   Filed 09/29/11   Page 5 of 8

## Overt Acts

23. In furtherance of the conspiracy, and to accomplish the objects thereof, COATS and his conspirators committed one or more overt acts in the Western District of North Carolina and elsewhere.

All in violation of 18 U.S.C. § 371.

## COUNT TWO
### (Money Laundering Conspiracy)

24. The United States Attorney realleges and incorporates by reference herein all of the allegations contained in paragraphs 1 through 19 of the Bill of Information, and further alleges that:

25. From in or about October 2007 through in or about December 2009, in Mecklenburg County, within the Western District of North Carolina, and elsewhere, the defendant,

### BRIAN KEITH COATS

did knowingly combine, conspire, and agree with Mr. D, Mr. T, Mr. S, Mr. M, Stephen Lacy, James Jordan, Roy Scarboro, and Jeffrey Muyres, and others unnamed in this Bill of Information, and known and unknown to the United States Attorney, to knowingly conduct and attempt to conduct a financial transaction affecting interstate and foreign commerce, which involved the proceeds of a specified unlawful activity, that is investment fraud conspiracy as charged in Count 1 of the Bill of Information, with the intent to promote the carrying on of specified unlawful activity, and that while conducting and attempting to conduct such financial transaction knew that the property involved in the financial transaction represented the proceeds of some form of unlawful activity in violation of Title 18, United States Code, Section 1956(a)(1)(A)(i).

All in violation of Title 18, United States Code, Section 1956(h).

7

## NOTICE OF FORFEITURE

26. Notice is hereby given of the provisions of 18 U.S.C. § 982 and 28 U.S.C. § 2461(c). Under section 2461(c), criminal forfeiture is applicable to any offenses for which forfeiture is authorized by any other statute, including but not limited to 18 U.S.C. § 981 and all specified unlawful activities listed or referenced in 18 U.S.C. § 1956(c)(7), which are incorporated as to proceeds by § 981(a)(1)(C). The defendant has or had a possessory or legal interest in the following property that is subject to forfeiture in accordance with section 982 and/or section 2461(c):

   a. all property involved in the violations alleged in this bill of information;

   b. all property which is proceeds of such violations; and

   c. in the event that any property described in (a) and (b) cannot be located or recovered or has been substantially diminished in value or has been commingled with other property which cannot be divided without difficulty, all other property of the defendant, to the extent of the value of the property described (a) and (b).

27. The following property is subject to forfeiture on one or more of the grounds stated above:

   a. all currency and monetary instruments constituting or derived from proceeds traceable to the scheme alleged in this bill of information, including but not limited to the sum of approximately $40,000,000 in proceeds;

ANNE M. TOMPKINS
UNITED STATES ATTORNEY

*[signed]* for KURT W. MEYERS
ASSISTANT UNITED STATES ATTORNEY

*[signed]*
MARK T. ODULIO
ASSISTANT UNITED STATES ATTORNEY

8